Joseph JAMROSZ, Jeffrey Jamrosz And Systems Communications, Inc., Appellants–Defendants,

v.

RESOURCE BENEFITS, INC., and Albert Volk, Appellees– Plaintiffs.

No. 45A03–0410–CV–467.

Court of Appeals of Indiana.

Dec. 27, 2005.

⊂�netext⊃237(5)

Lonnie M. Randolph, East Chicago, for Appellant.

Nick Katich, Stephanie Shappell, Katich & Shappell, Crown Point, for Appellee.

## OPINION

SHARPNACK, Judge.

Jeffrey Jamrosz, Joseph Jamrosz, and Systems Communications, Inc. ("SCI") (collectively, "Defendants") appeal a jury verdict in favor of Resource Benefits, Inc. ("Resource Benefits") and Albert Volk and the trial court's denial of a motion to correct error. Jeffrey raises four issues, which we restate as:

I. Whether the trial court abused its discretion by allowing Volk to testify regarding an alleged oral agreement where the parties had also entered into a written agreement with an integration clause;

II. Whether the trial court erred by denying Jeffrey's motion for judgment on the evidence under Ind. Trial Rule 50;

III. Whether the trial court erred by instructing the jury regarding a Federal Communications Commission ("FCC") regulation; and

IV. Whether the trial court abused its discretion by denying Jeffrey's motion to bifurcate the issues of liability and damages.

Joseph and SCI raise ten issues, which we consolidate and restate as:

V. Whether the evidence is sufficient to sustain the jury's verdict against Joseph and SCI for breach of contract, conversion, fraud, constructive fraud, and civil conspiracy;

VI. Whether the trial court erred by failing to rule on Joseph and SCI's motion for declaratory relief;

VII. Whether the trial court pierced the corporate veil by making Joseph jointly and severally liable for the jury's verdict;

VIII. Whether the trial court erred by denying Joseph and SCI's motion for judgment on the evidence under Ind. Trial Rule 50; and

IX. Whether the trial court erred when it failed to specify which portion of the verdict each Defendant was responsible for paying.

We affirm in part and reverse in part.[1]

The relevant facts follow. SCI is a corporation in the business of performing repairs and service on radios and also owns various radio towers, including one in Crown Point, Indiana. Joseph is the owner of SCI, and Jeffrey is Joseph's son.

---

1. We remind counsel for all of the parties that Ind. Appellate Rule 46 requires each fact to be "supported by page references to the Record on Appeal or Appendix." We also remind counsel for Jeffrey and counsel for Joseph and SCI that Ind. Appellate Rule 46 also requires that "[t]he argument must contain the conten-tions of the appellant on the issues presented, supported by cogent reasoning." Further, "[e]ach contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on ...." Ind. Appellate Rule 46.

Resource Benefits is a company formed by Volk, a pharmacist, to obtain Specialized Mobile Radio ("SMR") licenses.[2] In 1993 and 1994, Resource Benefits applied to the FCC for sixty SMR licenses and was eventually awarded four SMR licenses, including one in Crown Point, Indiana. The Crown Point license was issued on March 9, 1994. The license included five frequencies, and certain equipment and installations were necessary to make the system operational.

In December 1994, Volk contacted Joseph because Volk wanted to lease tower space from SCI and needed assistance in making the system operational. After they signed a lease in March 1995, Joseph found that the coordinates of the license were not the same as the coordinates for SCI's tower. Joseph advised Volk that Volk could not use his license on SCI's tower and that if Volk wanted to use the tower, he would have to move the license to the tower's coordinates. Additionally, because Resource Benefits had failed to construct the system for the Crown Point license within twelve months of being issued a license, as was required by FCC rules, the license was at risk of being cancelled.

According to Volk, Joseph orally proposed that Jeffrey would file a finder's preference application and that Jeffrey would request that the FCC move the frequencies to SCI's tower. A finder's preference application allowed individuals to assist the FCC in recovering licenses that had been cancelled automatically due to violations of FCC rules, such as the failure to timely construct the system. The finder's preference application allowed an individual to claim such licenses. Thus, if a finder's preference application was granted, the license would be in Jeffrey's name rather than Resource Benefits' name.

The parties agreed that Jeffrey would file a finder's preference application to save Resource Benefits' license, obtain an extra year to construct the system, and move the coordinates of the license. In return, the license would still belong to Resource Benefits, Resource Benefits would construct the system, and Resource Benefits would pay $15,000 to Jeffrey when Resource Benefits sold the license ("Oral Agreement"). According to Jeffrey, although he had ownership of the license on paper, he was merely a "namesake." Transcript at 161.

2. The FCC's website provides the following background on SMR licenses:

The Specialized Mobile Radio (SMR) service was first established by the Commission in 1979 to provide land mobile communications on a commercial (i.e., for profit) basis. A traditional SMR system consists of one or more base station transmitters, one or more antennas, and end user radio equipment that usually consists of a mobile radio unit either provided by the end user or obtained from the SMR operator for a fee. SMR end users may operate in either an "interconnected" mode or a "dispatch" mode. Interconnected mode interconnects mobile radio units with the public switched telephone network (PSTN). An end user may thus transmit a message with its mobile radio unit to the SMR base station. The call will then be routed to the local PSTN. This allows the mobile radio unit to function as a mobile telephone. Dispatch mode allows two-way, over the air, voice communications between two or more mobile units (e.g., between a car and a truck) or between mobile units and fixed units (e.g., between the end user's office and a truck). Typical SMR customers using dispatch communications include construction companies with several trucks at different jobs or on the road, with a dispatch operation in a central office.

Specialized Mobile Radio Service, available at http://www.wireless.fcc.gov/smrs (last visited Sept. 13, 2005).

Jeffrey filed a finder's preference application on October 18, 1995. Volk did not object to Jeffrey's finder's preference application. On December 6, 1996, the FCC notified Volk that Jeffrey had filed a finder's preference application, that Jeffrey presented evidence of a violation of 47 C.F.R § 90.631 (1995), and that a violation of this rule resulted in automatic cancellation of Resource Benefits' license. Specifically, Resource Benefits failed to construct the station at the licensed location, there was no activity detected on the frequencies, and Resource Benefits did not oppose the finder's preference. Thus, Resource Benefits' license was automatically cancelled, and Jeffrey was awarded the license. Volk then paid John Reardon, his attorney in Washington, D.C., to assist Jeffrey with moving the coordinates of the license. Jeffrey and Volk never met or talked about the agreement because they wanted to maintain the appearance of an "arm's length transaction" and to avoid the appearance or suggestion of collusion, which was against FCC regulations. Transcript at 162. The Oral Agreement and all further discussions were made between Joseph and Volk.

On February 5, 1997, Reardon faxed a draft of an agreement between Resource Benefits and Jeffrey to Volk. The draft agreement provided that, within one year, Jeffrey would sell the license, that payment for the license would be made directly to Volk, and that Jeffrey would be paid the greater of a set amount or a percentage of the sale price. The draft agreement also provided that, if Jeffrey failed to sell the license within one year, Jeffrey would construct the system and assign the license to Resource Benefits, and that Resource Benefits would pay $10,000.00 to Jeffrey. The draft agreement was never signed by the parties.

Reardon then drafted another agreement. According to Volk, on February 24, 1997, Joseph visited him and gave him the new agreement, which was already signed by Jeffrey. When Volk questioned why they needed it, Joseph said, "Just sign it. Jeff wants it. I don't know." Transcript at 272. Volk signed the agreement on behalf of Resource Benefits. Thus, Jeffrey and Resource Benefits entered into the following agreement ("Purchase Agreement"):

### ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") made as of the 24th day of February, 1997 by and between JEFFREY A. JAMROSZ ("Seller") and RESOURCE BENEFITS, INC. ("Buyer").

### RECITALS

A. Seller has obtained an award of a finder's preference for target station WPEF 815 and seeks to develop and file an application for permanent authorization of those facilities.

B. Seller desires to sell to Buyer and Buyer desires to purchase from Seller the License used in, or held for use, in connection with the System (the "Assets"). The "System" shall mean the frequencies originally licensed as station WPEF 815 in Crown Point, Indiana ..., as well as any associated equipment.

C. Seller and Buyer desire to enter into this Agreement to effect the management and then sale of the Assets to Buyer.

### AGREEMENTS

1. **Purchase and Sale of Assets.** Upon the terms and subject to the conditions hereinafter set forth, on the

Final Closing Date (as herein defined), Seller will sell and deliver to Buyer, and Buyer will purchase and acquire from Seller, all of Seller's right, title and interest in and to the Assets, in consideration of the payment by Buyer of the Purchase Price (as defined herein).

2. **FCC Consent.** Seller agrees to cooperate with Buyer in applying for consent from the FCC for the assignment of the License to Buyer or to a third party of Buyer's choosing. Such applications executed by the Seller shall be submitted to the FCC by Buyer within sixty (60) days of the Initial Closing Date (as defined herein).

 \* \* \* \* \* \*

4. **Purchase Price.** The purchase price shall be Fifteen Thousand Dollars ($15,000) of which Five Thousand Dollars ($5,000) will be paid by check or wire transfer at the Initial Closing and Ten Thousand Dollars ($10,000) and [sic] shall be paid by check or wire transfer on the Final Closing Date.

 \* \* \* \* \* \*

7. **Construction and Operation of the System.** Prior to the Final Closing Date, Buyer shall be responsible for overseeing, arranging for and directing the planning, designing, constructing, equipping and operating of the System and its business, all of the foregoing being subject to the general authority of Seller. Seller agrees that Buyer may assign these responsibilities to a third party, such as Nextel Communications.

In consideration of Buyer's willingness to construct the System, or appoint agents to construct the System, Seller agrees to lease to Buyer or its agents the right to use the System until the earlier of February 28, 1998 or the Final Closing Date subject only to Section 9 hereof. Buyer shall use its best efforts consistent with sound commercial practice to conduct such business and to render, assist with, obtain or contract for all services, as shall be necessary for the design, construction and operation of the System . . . .

 \* \* \* \* \* \*

8. **Costs.** Seller and Buyer agree that all of Buyer's costs in connection with the construction and its use of the System shall be paid by Buyer . . . .

9. **Retention of Control by Seller.** Prior to the Final Closing Date, Seller will supervise Buyer's activities and will retain control over all aspects of the System operation as required of a licensee under applicable FCC Rules and Regulations.

10. **Initial Closing.** The Initial Closing shall occur upon the completion of construction, but in no event later than September 1, 1997, Buyer shall deliver to Seller (i) a certificate signed by an officer of Buyer that construction of station WPEF 815 in accordance with FCC Rules and Regulations has been completed, and (ii) a cashier's check or wire transfer in the amount of Five Thousand Dollars ($5,000) (the "Initial Payment"); and Seller shall deliver to Buyer a signed FCC Form 490 providing for the license transfer to Buyer of the license for station WPEF 815.

11. **Final Closing.** It is the parties intention, that the Final Closing ("Final Closing") should occur within ninety (90) business days after the satisfaction or waiver of all closing conditions as listed below in Section 12 (other than conditions with respect to actions that each party will take on

the Final Closing Date itself). At the Final Closing, the parties will exchange any documents, assignments, bills of sale and other instruments called for by this Agreement or as Buyer may reasonably request. The Final Closing shall occur at a mutually convenient time and place.

\* \* \* \* \* \*

17. **Termination.** This Agreement shall terminate upon any of the following: (a) mutual agreement, in writing, by the Seller and Buyer or (b) failure of Closing to occur within one year of the date that this Agreement is executed by Seller and Buyer. In the event that the Initial Closing occurs and this Agreement is terminated pursuant to either (a) or (b) above, Seller shall be entitled to retain the Initial Payment.

\* \* \* \* \* \*

22. **Miscellaneous**.... This Agreement, together with the Exhibit hereto, constitutes the entire understanding and agreement between the parties hereto concerning the subject matter hereof, superseding all prior oral or written agreements or understandings. This Agreement may not be changed, modified or altered except by an agreement in writing executed by the parties hereto....

Appellant's Appendix at 12–23. According to Volk, the Purchase Agreement did not reflect the true nature of their agreement, and he never had an agreement with Jeffrey that involved payments at the time of initial or final closings.

Resource Benefits did not pay $5,000 to Jeffrey by September 1, 1997, and no final closing occurred. On May 23, 1998, Jeffrey prepared an amendment to the purchase agreement ("Amendment") as follows:

**PURCHASE AGREEMENT AMENDMENT**

This Purchase Agreement Amendment is made on behalf of both parties involved in the asset purchase agreement dated the 24th day of February 1997 between Jeffrey A. Jamrosz ("Seller") and Resource Benefits, Inc. ("Buyer").

Both parties, listed above, agree to extend the initial and final closing dates of the agreement due to the late reception of the FCC License involved by the Seller and slow monitory cash flow by the Buyer for construction and initial payment for closing. All other recitals of the agreement shall remain the same and effective. The initial closing date shall be changed to today's date of 5/23/98 in which the Seller delivers to Buyer a signed copy of FCC form 490 providing for the license transfer to Buyer for station WPEF 815. Seller agrees that station WPEF 815 has been constructed and will file form 490 with the FCC. Buyer shall provide initial closing payment in the amount of $5000.00. Final closing shall occur 90 business days from today's date as per original agreement.

Appellant's Appendix at 37. The Amendment was signed by Jeffrey, and, again, Joseph presented the document to Volk, who signed it on behalf of Resource Benefits. Jeffrey also provided Volk with a completed FCC form to transfer the license back to Resource Benefits, and Jeffrey signed the form. Defendant's Exhibit 5. However, Volk did not file the form with the FCC to get the license back. Volk also did not pay Jeffrey any money, and the final closing never occurred.

Later, Volk found a buyer for the license, but the buyer refused to negotiate with Volk because the license was not in

his name. Volk also contacted Nextel about selling the license. In August or September of 2000, Volk and Jeffrey talked on the telephone directly for the first time. According to Volk, he wanted to talk to Jeffrey about selling the license, and Jeffrey laughed and told him, "What license? You don't own any license." Transcript at 266. According to Jeffrey, he told Volk that he had a broker for the license and instructed Volk to contact the broker.

Two and one-half years after the Amendment to the Purchase Agreement was signed, on December 12, 2000, Jeffrey agreed to sell the license to Nextel for $687,500.00. The sale was completed on July 31, 2001. As a result, Resource Benefits and Volk filed a complaint against Jeffrey, Joseph, and SCI on October 19, 2001, for: (1) fraud; (2) breach of contract; (3) conversion; (4) civil conspiracy; and (5) constructive trust and declaratory relief. Jeffrey, Joseph, and SCI filed an answer and counterclaim for a frivolous lawsuit and declaratory judgment regarding validity of and applicability of the Purchase Agreement.

Prior to the start of the jury trial, the Defendants filed a motion to bifurcate the issues of liability and damages, which the trial court denied. During the jury trial, the trial court allowed Volk and Resource Benefits to admit evidence of the Oral Agreement over the Defendants' objection. At the close of Volk and Resource Benefits' evidence, the Defendants moved for judgment on the evidence pursuant to Ind. Trial Rule 50(A), which the trial court denied. During the trial, Volk and Resource Benefits argued that moving the coordinates of the license was unnecessary because FCC regulations allow a one-mile difference between the license coordinates and the tower coordinates and that a different tower was located within one mile of the original license's coordinates. At Volk and Resource Benefits' request, the trial court gave an instruction regarding that FCC regulation.

The jury found for Resource Benefits and Volk and against Jeffrey, Joseph, and SCI on each of the counts and awarded damages as follows: (1) $687,500.00 less $15,000.00 to Jeffrey on the breach of contract claim; (2) $10,000.00 on the fraud claim; (3) $10,000.00 on the constructive fraud claim; (4) $2,062,500.00 on the conversion claim; and (5) $10,000.00 on the civil conspiracy claim. The trial court entered judgment against Jeffrey, Joseph, and SCI, jointly and severally, and dismissed their counterclaim. Jeffrey, Joseph, and SCI filed a motion to correct error. The trial court denied the motion in part and granted the motion in part by reducing the total judgment against Jeffrey, Joseph, and SCI to $2,017,500.00.

I.

■ The first issue raised by Jeffrey is whether the trial court abused its discretion by allowing Volk to testify regarding the alleged Oral Agreement where the parties had also entered into a written agreement with an integration clause. The admission or exclusion of evidence falls within the sound discretion of the trial court and is reviewed only for abuse of discretion. *Litherland v. McDonnell,* 796 N.E.2d 1237, 1240 (Ind.Ct.App.2003), *trans. denied.* Thus, we will reverse only where the trial court's decision is "clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn from those facts and circumstances." *State v. Bishop,* 800 N.E.2d 918, 922 (Ind.2003), *reh'g denied.*

■ Jeffrey argues that the trial court abused its discretion by admitting evidence of the Oral Agreement between the parties

despite the parties' written agreement. In general, "[e]vidence, parol or otherwise, extrinsic to the written provisions of a contract will not be admitted for the purpose of varying or adding to that writing when it appears that both parties intended a complete integration of that contract in the written terms." *Franklin v. White*, 493 N.E.2d 161, 166 (Ind.1986). According to Jeffrey, the Oral Agreement varies the contract provisions and the contract provision contained an integration clause. Thus, according to Jeffrey, the Oral Agreement was inadmissible.

Volk and Resource Benefits argue that the Oral Agreement was admissible because the written contract was never intended to be a binding contract. Rather, according to Volk and Resource Benefits, the written contract was simply used by the parties to maintain the appearance of an arm's length transaction and to avoid the FCC viewing the parties' relationship as collusive.[3] Volk and Resource Benefits argue that evidence showing that the written contract was not intended to be binding is always admissible. Volk and Resource Benefits cite to the Seventh Circuit's opinion in *Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062 (7th Cir.1992). In *Herzog*, the Seventh Circuit court was considering the enforcement of two promissory notes where McGowen claimed that the promissory notes were never intended to be presented for pay-

ment but were used for tax advantages. *Herzog*, 976 F.2d at 1067–1068. Interpreting Indiana law, the court noted:

A holder of a promissory note who is not a holder in due course takes the note subject to "all defenses of any party which would be available in an action on a simple contract," UCC § 3–306(b), Ind.Code § 26–1–3–306(b), and one of those defenses, notwithstanding the parol evidence rule, is that the parties did not intend to create an enforceable contract. 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.4, at p. 212 (1990); James J. White & Robert S. Summers, *Handbook of the Law under the Uniform Commercial Code* § 2–10, at p. 78 (1980). "It is well settled that whatever the formal documentary evidence, the parties to a legal transaction may always show that they understood a purported contract not to bind them; it may, for example, be a joke, or a disguise to deceive others." *In re H. Hicks & Son*, 82 F.2d 277, 279 (2d Cir.1936) (L.Hand, J.); *see also Nice Ball Bearing Co. v. Bearing Jobbers, Inc.*, 205 F.2d 841, 845 (7th Cir.1953)[, *cert. denied*, 346 U.S. 911, 74 S.Ct. 242, 98 L.Ed. 408 (1953) ]. The deceived others may, of course, be able to object to the attempt to prove the contract a sham, as in *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir.

---

**3.** Volk and Resource Benefits cite to ¶ 56 of the "Discussion" to Amendments of Parts 1 and 90 of the FCC's Rules concerning Construction, Licensing, and Operation of Private Land Mobile Radio Stations, 1991 WL 638357, 6 F.C.C.R. 7297, which provided:

Finally, we adopt our proposal to required certification of noncompensation where the finder's request involves a failure to construct. By requiring the finder to certify that the target licensee has not or will not receive consideration of any kind in connection with the request, we will reduce the

likelihood of the finder's preference being used as a loophole to enable the assignment of unconstructed systems. We will interpret this requirement very strictly and will even look to such issues as the provision of services after construction to the original licensee at no cost or reduced cost. Should we find that there was any form of compensation, we will institute license revocation proceedings against the finder obtaining the license. We note that any false certifications to the Commission carry criminal penalties (18 U.S.C. § 1001).

1989) (en banc), and *FDIC v. O'Neil,* 809 F.2d 350 (7th Cir.1987), but that is not a factor here.

*Id.* at 1067.

Our court reached a similar conclusion in *Wallace v. Rogier,* 182 Ind.App. 303, 395 N.E.2d 297 (1979). *Wallace* concerned the enforcement of a contract for the sale of land. *Id.* at 304, 395 N.E.2d at 299. The buyers argued that the contract provided for the sale of the land, while the attorney who drafted the contract testified that he drafted the contract at the insistence of the buyer, who told the attorney that he needed the contract for obtaining money for the transaction. *Id.* at 304–305, 395 N.E.2d at 299. The attorney testified he drew up the document only after making it clear to the persons present that it was not binding and not enforceable and would be used for the sole purpose of showing it to the buyer's banker. *Id.* "In short, the document was to be treated as a sham as between the Rogiers and Wallaces." *Id.*

The trial court found for the seller of the property, and on appeal, we held:

> When two parties enter into a sham contract, as between themselves, there is no contract and the document is thus unenforceable. 6A A. Corbin, Corbin on Contracts s 1473 (1962); 17 C.J.S., Contracts, s 32; *New York Trust Co. v. Island Oil & Transport Corp.,* (2nd Cir. 1929) 34 F.2d 655. Of course, the cardinal rule of contract interpretation is to ascertain the intention of the parties from their expression of it. *Fort Wayne Bank Bldg., Inc. v. Bank Bldg. & Equipment Corp. of America,* (1974) 160 Ind. App. 26, 309 N.E.2d 464. The court does not examine hidden intentions secreted in the heart of a person, but rather examines the final expression found in conduct. *Robison v. Fickle,* (1976) Ind.App., 167 Ind.App. 651, 340 N.E.2d 824. However, the intention of the parties is to be determined in the light of surrounding circumstances which existed at the time the contract was made. *Standard Land Corporation of Indiana v. Bogardus,* (1972) 154 Ind. App. 283, 317, 289 N.E.2d 803, 823.
>
> In this case there was substantial evidence presented at trial from which we can conclude that neither party intended the document, at the time it was drafted and signed, to be a valid enforceable contract. We can find no purpose in enforcing it now. "As compensation, this would be fruitless; as punishment, it would be capricious; as law it would create an obligation Ex turpi causa." *New York Trust Co., supra* at 656. We find no error as to this issue.

*Id.* at 307–308, 395 N.E.2d at 299–301 (footnote omitted). The court distinguished "the situation where an unknowing third party, who relies on the sham contract, seeks to enforce it." *Id.* at 308 n. 2, 395 N.E.2d at 301. *See also* Annotation, *Admissibility of Oral Evidence to Show That a Writing Was a Sham Agreement Not Intended to Create Legal Relations,* 71 A.L.R.2d 382 (1960, 1995 Later Case Service, & Supp.2005); 29A AM. JUR. 2D *Evidence* § 1109 (1994).

Similarly, here, according to Volk and Resource Benefits, an Oral Agreement existed between Resource Benefits and Jeffrey that Jeffrey would obtain a finder's preference but the license would remain the property of Resource Benefits. Under the Oral Agreement, when the license was sold, Jeffrey would be paid $15,000. Volk contends that the Oral Agreement violated the FCC's rules against collusion. Thus, according to Volk, the written Purchase Agreement and Amendment did not reflect the parties' true agreement but was signed simply to avoid the appearance of collusion, and the written agreements were merely sham contracts. Under these cir-

cumstances, the parol evidence rule did not bar the admission of evidence regarding the Oral Agreement, and it was the jury's duty to determine the true intent of the Purchase Agreement and Amendment. *See, e.g., Herzog*, 976 F.2d at 1067; *Wallace*, 182 Ind.App. at 307–308, 395 N.E.2d at 299–301. The trial court did not abuse its discretion by admitting evidence of the Oral Agreement.

## II.

■ The next issue is whether the trial court erred by denying Jeffrey's motion for judgment on the evidence under Ind. Trial Rule 50(A). Ind. Trial Rule 50(A) allows a motion for judgment on the evidence "[w]here all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it . . . ." In reviewing the trial court's ruling on a motion for judgment on the evidence, we must consider only the evidence and reasonable inferences most favorable to the nonmoving party. *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1051 (Ind.2003). "Judgment on the evidence in favor of the defendant is proper when there is an absence of evidence or reasonable inferences in favor of the plaintiff upon an issue in question." *Id.* The evidence must support without conflict only one inference, which is in favor of defendant. *Id.* "If there is any probative evidence or reasonable inference to be drawn from the evidence or if there is evidence allowing reasonable people to differ as to the result, judgment on the evidence is improper." *Id.*

■ Jeffrey argues that the trial court should have granted his motion for judgment on the evidence because: (1) the Oral Agreement was too indeterminate to

be enforceable and was not enforceable under the statute of frauds; (2) Jeffrey was entitled to judgment on his counterclaim for declaratory relief under the written contract because the written contract was unambiguous; and (3) the evidence was insufficient to prove conversion, fraud, constructive fraud, and civil conspiracy. However, as Volk and Resource Benefits point out, Jeffrey's motion for judgment on the evidence was based upon the following arguments: (1) the statute of limitations on conspiracy, civil conspiracy, conversion, and constructive fraud claims had expired; (2) he was entitled to declaratory relief on the counterclaim that the written contract is enforceable because "no reasonable jury could conclude there was fraud in the inducement, or any other basis upon which to vitiate and void the terms of the written contract;" and (3) the law presumes a reasonable time for performance of a contract with no deadline and Volk failed to perform within a reasonable time. Transcript at 456.

■ None of the arguments raised in Jeffrey's brief as error in denying the motion for judgment on the evidence were part of his motion for judgment on the evidence made to the trial court. Because Jeffrey attempts to raise different issues on appeal than he raised to the trial court in his motion for judgment on the evidence, he has waived appellate review of his first two arguments raised on appeal. *See, e.g., Faulk v. Northwest Radiologists, P.C.*, 751 N.E.2d 233, 238 n. 4 (Ind.Ct.App. 2001) (holding that an appellant waived review of his incurred risk argument where his motion for judgment on the evidence was based upon contributory negligence), *trans. denied*. However, even in a civil case, a party may raise a sufficiency of the evidence claim for the first time in an appellant's brief. *See, e.g., Walker v. Pillion*, 748 N.E.2d 422, 424–426

(Ind.Ct.App.2001) (holding that an appellant was not required to move for judgment on the evidence in the trial court before arguing on appeal that the evidence was insufficient to support a verdict despite the language of Ind. Trial Rule 50(A)(5)). Consequently, we will address Jeffrey's sufficiency arguments.

Before addressing the specific sufficiency arguments, we note that although the jury awarded damages based upon breach of contract, fraud, constructive fraud, civil conspiracy, and conversion, the trial court limited the total damages to solely the conversion judgment damages because of double recovery concerns. The jury awarded damages as follows: (1) $687,500.00 less $15,000.00 to Jeffrey on the breach of contract claim; (2) $10,000.00 on the fraud claim; (3) $10,000.00 on the constructive fraud claim; (4) $2,062,500.00 on the conversion claim, which is $687,500.00 multiplied by three for treble damages; and (5) $10,000.00 on the civil conspiracy claim. The trial court later reduced the total judgment against Jeffrey, Joseph, and SCI to $2,017,500.00, which is $687,500.00 minus the $15,000.00 owed to Jeffrey and multiplied by three for treble damages. Thus, because of concerns of a double recovery, the total damages were based solely upon the conversion count. *See, e.g., INS Investigations Bureau, Inc. v. Lee,* 784 N.E.2d 566, 577 (Ind.Ct.App.2003) (holding that a plaintiff could not recover damages for both tort and breach of contract, thus allowing a double recovery for a single wrong), *trans. denied.* As a result, we begin by addressing the sufficiency of the evidence supporting the conversion judgment.

■■■ In reviewing the sufficiency of evidence in a civil case, we will decide whether there is substantial evidence of probative value supporting the trial court's judgment. *Martin v. Roberts,* 464 N.E.2d

896, 904 (Ind.1984). We neither weigh the evidence nor judge the credibility of witnesses but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Id.* "Only if there is a lack of evidence or evidence from which a reasonable inference can be drawn on an essential element of the plaintiff's claim will we reverse a trial court." *Id.*

■■■ Under Ind.Code § 34–24–3–1, a person who proves the elements of criminal conversion by a preponderance of the evidence can recover up to three times the actual damages, the costs of the action, and reasonable attorney's fees. *Whitaker v. Brunner,* 814 N.E.2d 288, 297 (Ind.Ct. App.2004), *trans. denied.* Ind.Code § 35–43–4–3 provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor." "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind.Code § 35–41–2–2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35–41–2–2(b). Ind.Code § 35–43–4–1(a) provides that to " 'exert control over property' means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Finally, Ind.Code § 35–43–4–1(b) provides that a person's control over property of another person is "unauthorized" if it is exerted:

(1) without the other person's consent;

(2) in a manner or to an extent other than that to which the other person has consented;

\* \* \* \* \* \*

(4) by creating or confirming a false impression in the other person;

(5) by failing to correct a false impression that the person knows is influencing the other person, if the person stands in a relationship of special trust to the other person;

(6) by promising performance that the person knows will not be performed;

(7) by expressing an intention to damage the property or impair the rights of any other person;

\* \* \* \* \* \*

Unlike in a criminal trial, a claimant need only prove by a preponderance of the evidence that the criminal act was committed by the defendant. *Gilliana v. Paniaguas*, 708 N.E.2d 895, 899 (Ind.Ct.App.1999), *reh'g denied, trans. denied.*

 Jeffrey argues, in part, that the evidence is insufficient to prove the mens rea required for conversion and that conversion requires more than a mere breach of contract. We have observed that "the mens rea requirement 'differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to cover." ' *Whitaker*, 814 N.E.2d at 297 (quoting *Greco v. KMA Auto Exch., Inc.*, 765 N.E.2d 140, 147 (Ind.Ct.App.2002), and *Gilliana*, 708 N.E.2d at 899). "The legislature did not intend to criminalize bona fide contract disputes." *Id.* (quoting *Greco*, 765 N.E.2d at 147, and *NationsCredit Commercial Corp. v. Grauel Enter., Inc.*, 703 N.E.2d 1072, 1078 (Ind.Ct.App.1998), *reh'g denied, trans. denied* ).

In *NationsCredit*, 703 N.E.2d at 1079, we concluded that a trial court was clearly in error when it found that NationsCredit had committed criminal conversion. There, NationsCredit, a commercial lender, and Grauel Enterprises, its borrower,

were in a dispute concerning ownership of prompt-payment discounts accumulated in a "Reserve Account" maintained by NationsCredit under a financing and security agreement. *Id.* at 1074. After a bench trial, the trial court concluded:

NationsCredit's representatives understood the nature of a security interest as opposed to outright ownership; thus their testimony that NationsCredit held a security interest in property which it concurrently owned outright is not persuasive. The Court finds that NationsCredit knowingly and intentionally withheld the inventory purchase discounts which belonged to Grauel after Grauel had fully satisfied its debts and obligations to NationsCredit.

*Id.* at 1078. Thus, the trial court found that NationsCredit had committed criminal conversion.

On appeal, we noted that "[t]he gravamen of the present action is contract construction." *Id.* The trial court had found the parties' contract to be ambiguous, and we affirmed that determination. *Id.* We concluded that "[a] contract is ambiguous when it is reasonably susceptible of different constructions," and "[i]t is this same ambiguity that precludes a finding of the required mens rea" for criminal conversion. *Id.* Although Grauel argued that NationsCredit "slipped" the ambiguous ownership language into the parties' contract, we noted that Grauel was represented by counsel and by an accountant when negotiating the ambiguous documents. *Id.* at 1079. Finally, there was no pattern of NationsCredit taking unauthorized control over money belonging to others. *Id.* Thus, we concluded that this was a contract dispute, and the trial court was clearly erroneous when it found NationsCredit had committed criminal conversion. *Id.*

On the other hand, in *Greco*, 765 N.E.2d at 148, we concluded that KMA had com-

mitted criminal conversion. There, the automobile dealer refused to release a truck to Greco after his $1000 down payment check was returned for insufficient funds even though he had obtained a loan for the remaining cost of the vehicle. *Id.* at 142–143. The trial court found that a security agreement existed and that KMA was entitled to possession of the vehicle. *Id.* at 144–145. On appeal, we concluded that KMA did not have a security agreement and that KMA exerted unauthorized control over Greco's property. *Id.* at 148. We further concluded that "KMA did so knowingly because neither the security agreement nor the order gave KMA a right to possession of the vehicle." *Id.* KMA had been informed by Greco's attorney "that they had no right to the truck and that it must be returned[,]" and "KMA presented no evidence indicating that it had acted upon a reasonable interpretation of an ambiguous contract or that this was a transaction between sophisticated business entities." *Id.* Thus, we concluded that Greco established the elements of criminal conversion by a preponderance of the evidence. *Id.*

Similarly, in *Midland–Guardian Co. v. United Consumers Club, Inc.,* 499 N.E.2d 792 (Ind.Ct.App.1986), *reh'g denied,* we affirmed the trial court's finding that Midland had committed criminal conversion. There, Midland purchased installment contracts from United Consumers Club ("Club"), a franchisor. *Id.* at 794. Midland paid an agreed upon price for the contracts less a certain percentage retained in a "holdback reserve fund." *Id.* Midland did not own the fund but had the right to charge back uncollectible contracts against it. *Id.* Midland refused to transfer the fund to the Club after termination of the parties' business relationship, and the trial court found it liable for criminal conversion. *Id.* at 794–95.

On appeal, we concluded that Midland had no contractual right to the fund, that Midland's claims of an administrative oversight were unpersuasive given evidence of a pattern of unauthorized control over others' money by Midland, and that Midland did not attempt to explain why it actively discouraged and hindered the Club's and other parties' rightful claims. *Id.* at 798. Thus, we concluded that the evidence demonstrated a high probability that Midland was aware its control of the Club's funds was unauthorized. *Id.*

■ Here, there is no evidence of a pattern of unauthorized control over others' licenses or money by the Defendants. Additionally, although the Defendants were apparently more sophisticated in FCC license issues than Volk, we note that Volk was represented by counsel from Washington, D.C., who was, apparently, quite familiar with FCC requirements. On the other hand, the evidence most favorable to the jury's verdict demonstrated that the parties entered into an oral agreement by which Jeffrey agreed to file a finder's preference application and later return the license to Volk in exchange for $15,000.00. Jeffrey admitted that, although he had ownership of the license on paper, he was merely a "namesake." Transcript at 161. Despite this agreement, Joseph had Volk sign a written agreement and when Volk questioned why they needed the agreement, Joseph said, "Just sign it. Jeff wants it. I don't know." *Id.* at 272. According to Volk, the written agreement was a sham and did not reflect the parties' true agreement. Despite the parties' oral agreement that Jeffrey would return the license to Volk, he sold the license to Nextel for $687,500.00. The jury determined that Jeffrey knowingly or intentionally exerted unauthorized control over Volk's property, and there is evidence to support that determination.

This was not a case of an "innocent breach of contract," and we conclude that Volk and Resource Benefits established the elements of criminal conversion by a preponderance of the evidence. *See, e.g., Greco,* 765 N.E.2d at 148.

We need not address the other sufficiency claims regarding the breach of contract, fraud, constructive fraud, and civil conspiracy judgments because the judgment is sustainable on the basis of the conversion. *See Picadilly, Inc. v. Colvin,* 519 N.E.2d 1217, 1221 (Ind.1988) ("A general verdict will be sustained if the evidence is sufficient to sustain any theory of liability.").

### III.

The next issue is whether the trial court erred by instructing the jury regarding a FCC regulation. At Volk and Resource Benefits' request, the trial court instructed the jury as follows:

 The Court has taken judicial notice of the following:

Pursuant to the regulations of the Federal Communications Commission which were in effect during all times relevant to this case, if one constructed and operated a Specialized Mobile Radio facility within one mile of the coordinates designated in the license issued by the Federal Communications Commission, then one would be in substantial compliance with the licensed coordinates.

You shall accept this fact as conclusively proved.

Appellant's Appendix at 94. Jeffrey did not object to this instruction.[4] This issue is, therefore, waived on appeal. *See, e.g., Estate of Hunt v. Board of Comm'rs of Henry County,* 526 N.E.2d 1230, 1236 n. 5 (Ind.Ct.App.1988) (holding that a party

waived an allegation that an instruction was erroneous where the party failed to object at trial to the instruction on those grounds), *reh'g denied, trans. denied; see also* Ind. Trial Rule 51(C) ("No party may claim as error the giving of an instruction unless he objects thereto ... stating distinctly the matter to which he objects and the grounds of his objection.").

### IV.

 · The next issue is whether the trial court abused its discretion by denying Jeffrey's motion to bifurcate the issues of liability and damages. The bifurcation of issues of liability and damages is governed by Ind. Trial Rule 42(C), which provides:

Submission to Jury in Stages. The Court upon its own motion or the motion of any party for good cause shown may allow the case to be tried and submitted to the jury in stages or segments including, but not limited to, bifurcation of claims or issues of compensatory and punitive damages.

The trial court is granted a wide degree of latitude in exercising its proper discretion in granting a motion for separation of trials, and we will reverse the denial only for an abuse of that discretion. · *Elkhart Cmty. Sch. v. Yoder,* 696 N.E.2d 409, 414 (Ind.Ct.App.1998). The court balances the interests of · convenience and economy against the likelihood of substantial prejudice to the ·defendant's case. *Id.* If practicable, one trial is preferred. *Id.* While the avoidance of prejudice is a more than sufficient reason for a separate trial, a separate trial should not be granted solely upon the moving party's speculation that it might be prejudiced by certain testimony. *Id.* (citing *Frito–Lay, Inc. v. Cloud,* 569 N.E.2d

---

4. Joseph and SCI also raise this issue on appeal. Like Jeffrey, Joseph and SCI failed to object to the instruction and have waived the argument on appeal. *Estate of Hunt,* 526 N.E.2d at 1236 n. 5.

983, 990 (Ind.Ct.App.1991)). In *Frito–Lay*, we observed:

> If an issue can be conveniently and expeditiously resolved, a separate trial may be ordered in the interest of judicial economy. 3 W. HARVEY at p. 193. If the proof of damages will be complicated and costly the issue of liability could first be separately tried. *Rickenbacher Transportation, Inc. v. Pennsylvania Railroad Co.*, (S.D.N.Y.1942), 3 F.R.D. 202. This was the specific purpose in adding subdivision (C) to T.R. 42. 3 W. HARVEY at p. 193. However, a federal court has observed that while the separation of trials can result in judicial economy when the defendant prevails on the issue of liability (by obviating the need for a trial on damages), the defendant must first convince the court that it has a persuasive argument on the question of liability in order to justify the potential risk and expense of two trials. *Fetz v. E & L Truck Rental Co.*, (S.D.Ind., 1987), 670 F.Supp. 261.

*Frito–Lay*, 569 N.E.2d at 990.

 Jeffrey filed a motion to bifurcate the trial of liability and damages, which the trial court denied. On appeal, Jeffrey argues that the trial court abused its discretion by denying his motion because "[o]nce the jury hears Jeffrey made $687,500.00 selling his license and equipment to Nextel, he cannot unring the bell." Jeffrey's Appellant's Brief at 28. Jeffrey, in effect, argues that he was prejudiced by the jury hearing the $687,500.00 Nextel purchase price.

In *Frito–Lay*, after concluding that retrial was necessary on other issues, we also held that the trial court abused its discretion when it denied the defendant's motion for bifurcation of the issues of liability and damages in a case involving an automobile accident and severe personal injuries of the sixteen-year-old plaintiff.

*Frito–Lay*, 569 N.E.2d at 990. There, the defendant argued that the jury was "inundated with evidence that inevitably created sympathy" for the plaintiff. *Id.* Frito–Lay asserted that "the order of the presentation of evidence regarding liability and damages was intertwined for no reason other than to evoke the jury's sympathy for the [plaintiffs] and prejudice the jury's ability to render a verdict in favor of Frito–Lay on the issue of liability." *Id.*

We concluded that the issues of liability and damages were not intertwined and evidence of the plaintiff's injuries was not necessary to prove the cause of the accident. *Id.* Further, the planned presentation of the plaintiff's evidence and witnesses did not make bifurcation inappropriate because the medical evidence was admitted into evidence in the form of depositions either read into evidence or shown on videotape. *Id.* Finally, the jury did not need to hear days of medical, neuropsychological, and economic testimony before it could understand that the plaintiff's injuries left her with no memory of the accident. *Id.* at 990–991.

We held that we could not "imagine a case more appropriate for bifurcation" because the plaintiff would not suffer any prejudice if the issues of liability and damages were tried separately and the potential for the prejudice of Frito–Lay's defense amounted to much more than mere speculation. *Id.* at 991. Moreover, the bifurcation of the issues of liability and damages had "great potential for maximizing judicial economy" because Frito–Lay's defense on the issue of liability was very strong. *Id.* As a result, we concluded "that the denial of a motion for the bifurcation on the issues of liability and damages in the retrial of this case would constitute an abuse of discretion." *Id.*

On the other hand, in *Elkhart Cmty. Sch.*, 696 N.E.2d at 415, we concluded that

the trial court did not abuse its discretion by denying the defendant's motion for bifurcation of liability and damages issues. There, one student was killed and one student severely injured when a fifteen-passenger school van carrying eight students was involved in a collision. *Id.* at 412. Although the van was equipped with seat belts, the student passengers were not wearing them because the students either could not find the belts, could not figure out how to operate them, or found the belts to be inoperable. *Id.* We held that the trial court did not abuse its discretion by denying the motion for bifurcation because the School demonstrated no independent grounds for reversal and failed to demonstrate a strong defense on the liability issue. *Id.* at 415. Further, the issues of damages and liability were intertwined because the basis for the School's liability—the breach of its duty to provide functional seat belts—was directly related to the nature and severity of the victims' injuries. *Id.*

Here, Jeffrey argues that the jury's determination on liability was influenced by the $687,500.00 Nextel purchase price. As in *Frito–Lay*, the issues of damages and liability are not intertwined in this case. However, unlike in *Frito–Lay*, the proof of damages was not complicated and costly, and Jeffrey did not present an argument that judicial economy would have been served by bifurcation because he had a strong defense on the liability claim. Although we fail to see how Volk and Resource Benefits would have been prejudiced by bifurcation, we conclude that any prejudice to Jeffrey is pure speculation. *Frito–Lay,* 569 N.E.2d at 991. Under these circumstances, we cannot say that Jeffrey showed good cause for bifurcating the issues of liability and damages or that the trial court's denial of Jeffrey's motion for bifurcation was an abuse of discretion. *See, e.g., Elkhart Cmty. Sch.,* 696 N.E.2d at 415 ("We cannot say the trial court abused its discretion when it declined to bifurcate the trials on the damages and liability issues.").

## V.

Joseph raises the next issue, which is whether the evidence is sufficient to sustain the jury's verdict against Joseph and SCI for breach of contract, conversion, fraud, constructive fraud, and civil conspiracy. In reviewing the sufficiency of evidence in a civil case, we will decide whether there is substantial evidence of probative value supporting the trial court's judgment. *Martin,* 464 N.E.2d at 904. We neither weigh the evidence nor judge the credibility of witnesses but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Id.* "Only if there is a lack of evidence or evidence from which a reasonable inference can be drawn on an essential element of the plaintiff's claim will we reverse a trial court." *Id.*

### A. Joseph.

■ Joseph argues that the conversion judgment is not supported by sufficient evidence because it involved a mere contract dispute and he never had possession of the license. We concluded in Part II, *supra,* that the conversion judgment against Jeffrey was supported by sufficient evidence. The same analysis applies to Joseph. The evidence most favorable to the jury's verdict demonstrated that Joseph arranged the oral agreement by which Jeffrey agreed to file a finder's preference application and later return the license to Volk in exchange for $15,000.00. Despite this agreement, Joseph had Volk sign a written agreement and when Volk questioned why they needed the agreement, Joseph said, "Just sign it. Jeff

wants it. I don't know." *Id.* at 272. According to Volk, the written agreement was a sham and did not reflect the parties' true agreement. All communications between Jeffrey and Volk were handled by Joseph. Despite the parties' oral agreement that Jeffrey would return the license to Volk, Jeffrey sold the license to Nextel for $687,500.00. The jury determined that Joseph knowingly or intentionally exerted unauthorized control over Volk's property, and there is evidence to support that determination. Consequently, we also affirm the conversion judgment against Joseph. *See, e.g., Greco,* 765 N.E.2d at 148.

Because we have concluded that the conversion judgment against Joseph is supported by sufficient evidence, we need not address the other sufficiency claims regarding the breach of contract, fraud, constructive fraud, and civil conspiracy judgments. *See supra* Part II; *Picadilly,* 519 N.E.2d at 1221 ("A general verdict will be sustained if the evidence is sufficient to sustain any theory of liability.").

## B. *SCI.*

▇▇▇ As for SCI, the evidence reveals that SCI was involved in this situation because it entered into a lease agreement with Resource Benefits and also sold equipment to Resource Benefits. There was no evidence to support a conclusion that Joseph was acting on behalf of SCI when he and Jeffrey entered into the Oral Agreement with Volk. Further, Volk and Resource Benefits presented no evidence that SCI was involved in the oral or written agreements regarding the transfer of the FCC license or exerted unauthorized control over the FCC license. Further, on appeal, Volk and Resource Benefits devote most of their arguments to the evidence against Jeffrey and Joseph and point to no specific evidence that SCI was involved in the fraud, constructive fraud, or civil conspiracy. We conclude that the evidence is insufficient to support a judgment of conversion, breach of contract, fraud, constructive fraud, or civil conspiracy against SCI, and we reverse those judgments against SCI. *See, e.g., DiMizio v. Romo,* 756 N.E.2d 1018, 1021 (Ind.Ct.App.2001) (holding that the defendant's wife was not a proper party to the breach of contract action because there was no contractual relationship with her).

## VI.

The next issue is whether the trial court erred by failing to rule on Joseph and SCI's motion for declaratory relief. After Volk and Resource Benefits filed their complaint, Jeffrey, Joseph, and SCI filed a counterclaim for declaratory judgment regarding validity of and applicability of the asset purchase agreement. The request for declaratory judgment alleged that the parties had executed a Purchase Agreement and an Amendment thereto, that those two documents "constitute[d] the entire understanding and agreement" of the parties, that the contract was expired and Volk had refused or failed to perform under the contract, and that the Defendants were entitled to a declaratory judgment regarding the rights and responsibilities of the parties. Appellant's Appendix at 70–71.

The Indiana Uniform Declaratory Judgment Act provides that when a request for declaratory judgment involves an issue of fact, "the issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." Ind.Code § 34–14–1–9. As discussed above, *see supra* Part I, the trial court properly permitted the admission of evidence concerning the Oral Agreement and the alleged true intent of the Purchase Agreement and Amendment

thereto. The trial court allowed the jury to weigh the evidence concerning the parties' agreements and to determine the intent of the Purchase Agreement and Amendment. Issues of fact existed concerning the parties' agreements, and the trial court properly submitted the issues to the jury. *See, e.g., Angleton v. Estate of Angleton,* 671 N.E.2d 921, 928 (Ind.Ct. App.1996) (holding that the probate court properly held an evidentiary hearing on an issue of fact in a declaratory judgment action), *trans. denied.*

## VII.

The next issue is whether the trial court pierced the corporate veil by making both Joseph and SCI liable for the jury's verdict. Joseph argues that the trial court erred by making him personally liable because he was working on behalf of his company, all of his acts, discussions, and meetings were within the scope of his duties as an employee, and he should not be personally liable for any corporate judgment. Joseph contends that the trial court pierced the corporate veil by making him personally liable.

■ In general, "individual shareholders of a corporation are not personally responsible for the obligations of the corporation." *Escobedo v. BHM Health Assoc., Inc.,* 818 N.E.2d 930, 932 (Ind.2004). However, as discussed above, *see supra* Part V, the evidence was sufficient to show that Joseph participated in the conversion personally, but the evidence was insufficient to show any involvement by SCI. The trial court did not pierce the corporation veil to make Joseph liable. Rather, he was liable due to his own actions. *See, e.g., Mullis v. Brennan,* 716 N.E.2d 58, 62–63 (Ind.Ct.App.1999) (holding that the trial court did not pierce the corporate veil to burden the defendant with individual liability).

## VIII.

The next issue is whether the trial court erred by denying Joseph and SCI's motion for judgment on the evidence under Ind. Trial Rule 50. Joseph and SCI raise this issue by arguing that "the jury's verdict was against the manifest weight of the evidence" and that they are entitled to "judgment notwithstanding the jury's verdict." Joseph and SCI's Appellant's Brief at 23. As Ind. Trial Rule 50(E) abolished motions for judgment notwithstanding a verdict, we presume that Joseph and SCI are arguing they were entitled to judgment on the evidence under Ind. Trial Rule 50(A).

According to Joseph and SCI, they are entitled to judgment on the evidence because: (1) they were entitled to declaratory judgment regarding the Purchase Agreement and Amendment; (2) the Purchase Agreement and Amendment were unambiguous and should have been enforced; and (3) the Oral Agreement was unenforceable under the statute of frauds. However, at trial, the Defendants' motion for judgment on the evidence was based upon the following arguments: (1) the statute of limitations on conspiracy, civil conspiracy, conversion, and constructive fraud claims had expired; (2) they were entitled to declaratory relief on their counterclaim that the written contract is enforceable because "no reasonable jury could conclude there was fraud in the inducement, or any other basis upon which to vitiate and void the terms of the written contract"; and (3) the law presumes a reasonable time for performance of a contract with no deadline and Volk failed to perform within a reasonable time. Transcript at 456. None of the arguments raised in Joseph and SCI's brief as error in denying the motion for judgment on the evidence were part of the motion for judg-

ment on the evidence made to the trial court. Because Joseph and SCI attempt to raise different issues on appeal than they raised to the trial court in their motion for judgment on the evidence, they have waived appellate review of the arguments. *See, e.g., Faulk,* 751 N.E.2d at 238 n. 4 (holding that an appellant waived review of his incurred risk argument where his motion for judgment on the evidence was based upon contributory negligence).

## IX.

The final issue is whether the trial court erred when it failed to specify which portion of the verdict each Defendant was responsible for paying. Joseph and SCI maintain that the trial court's reduced judgment of $2,017,500 is "confusing because it fails to specify what portion pertains to which counts and it does not specify which defendant is responsible for what portion of the reduce [sic] judgment." Appellant, Joseph and SCI's Brief at 29.

The jury found for Resource Benefits and Volk and against Jeffrey, Joseph, and SCI on each of the counts and awarded damages as follows: (1) $687,500.00 less $15,000.00 to Jeffrey on the breach of contract claim; (2) $10,000.00 on the fraud claim; (3) $10,000.00 on the constructive fraud claim; (4) $2,062,500.00 on the conversion claim; and (5) $10,000.00 on the civil conspiracy claim. The trial court entered judgment against Jeffrey, Joseph, and SCI, jointly and severally, and dismissed their counterclaim. Jeffrey, Joseph, and SCI filed a motion to correct error. The trial court denied the motion in part and granted the motion in part by reducing the total judgment against Jeffrey, Joseph, and SCI to $2,017,500.00.

We find nothing confusing about the trial court's judgment. The trial court awarded $2,017,500.00, which is $687,500.00 minus $15,000.00 multiplied by three for treble damages, to Volk and Resource Benefits and against Jeffrey, Joseph, and SCI jointly and severally. "The term 'joint and several' means that all parties are bound individually (severally) and as a unit (jointly)." *Scott v. Randle,* 736 N.E.2d 308, 314 (Ind.Ct.App.2000). Although we have reversed the judgments against SCI, a judgment in the amount of $2,017,500.00 against Jeffrey and Joseph, jointly and severally, remains.

In summary, we reverse all of the judgments against SCI. However, the judgments against Jeffrey and Joseph stand. Thus, a judgment in the amount of $2,017,500.00 against Jeffrey and Joseph, jointly and severally, remains.

For the foregoing reasons, we reverse the judgments against SCI and affirm the judgments against Jeffrey and Joseph.

Affirmed in part and reversed in part.

MAY, J. and VAIDIK, J. concur.