MIDLAND–GUARDIAN COMPANY and Midland-Guardian Company of Indiana, Inc., Appellants (Defendants Below),

v.

UNITED CONSUMERS CLUB, INC., Appellee (Plaintiff Below).

No. 3–1185A301.

Court of Appeals of Indiana, Third District.

Nov. 13, 1986.

John W. Hammel, Yarling, Robinson, Hammel & Lamb, Indianapolis, Clyde D. Compton, Hodges, Davis, Gruenberg, Compton & Sayers, P.C., Merrillville, for appellants.

Jeffery J. Dywan, Chudom & Meyer, Schererville, for appellee.

HOFFMAN, Judge.

The Midland Guardian Company and its wholly owned subsidiary the Midland Guardian Company of Indiana, Inc. (collectively referred to as "Midland") appeal from an adverse judgment entered in favor of the appellees, United Consumer Clubs, Inc. ("UCC"). The case was tried by the court which entered written "Findings of Fact and Conclusions of Law." The initial statement of facts that follows is largely taken from the trial court's findings.

This lawsuit, which was filed in 1978, centers around Midland's unauthorized retention of UCC's funds after the termination of the parties' business relationship. UCC's primary business is the sale and service of consumer club memberships through its outlets located in several states. Some of these outlets are directly owned and operated by UCC and others are

operated by independent franchisees. The membership sales are often financed in the same manner as other consumer credit transactions, with an installment contract permitting payments over a number of months and charging interest at an appropriate rate.

Midland is actually a part of a much larger, highly diversified corporation. For all relevant purposes, Midland is a finance company engaged in the business of making, purchasing and collecting installment loans.

For a number of years prior to 1976 Midland and UCC had a business relationship whereby UCC sold its installment contracts to Midland. These transactions were governed by documents called Holdback Reserve Agreements (HBRA) which were entered into by each UCC outlet, and covered all installment contracts that Midland purchased from the outlet. The construction and application of the HBRA are at the core of this appeal.

The HBRAs established a business framework where Midland paid UCC an agreed price for the outstanding contract balance, less a certain percentage that Midland retained to create a holdback reserve fund. According to the HBRA, the reserve fund was used by Midland as an account against which uncollectible contracts were charged. The agreement provided that these charged back contracts were to be regularly accounted for and reassigned to UCC or the franchisee so that further collection efforts could be made.

The reserve fund was subject to accounting every six to twelve months, depending on the individual agreement. When the reserve exceeded a certain percentage of the total outstanding contract balances, Midland was to remit the excess to UCC or the appropriate franchisee.

The HBRAs also had provisions regarding assignments of the holdback reserve funds. The pertinent paragraph, which designates Midland as the "Corporation" and UCC as the "Dealer" reads:

"No assignment of the Dealer's rights hereunder may be made unless agreed upon and accepted by the Corporation in writing. Any accounting due or payment hereunder may be made by the Corporation to the Dealer, and such shall discharge the Corporation's liability hereunder regardless of any transfer on assignment made by the Dealer."

Also, in the event that the parties ceased doing business, Midland could retain the entire reserve until all outstanding installment contracts were liquidated.

In 1975 UCC terminated and assumed direct control of six franchises. The exact manner and form of the terminations varied, but all former franchisees assigned their rights to the reserve funds held by Midland. After each termination a UCC corporate officer visited the local branch of Midland and gave the branch officer a corporate resolution granting full operational authority to the new UCC branch manager. Midland did not request additional information about these assignments for several years.

On or around May 1, 1976 Midland notified UCC that it would no longer purchase installment contracts. This triggered the provision of the contract that permitted Midland to retain the reserve fund until all contracts were liquidated. At the time the parties ceased doing business, Midland held a total of $25,815.09 in holdback reserve accounts for the UCC owned outlets and the originally franchised outlets. Through 1976 and 1977 UCC made various demands for accounting and return of charged back contracts and the reserve funds. However Midland made no tangible response to these demands until June 1977, when further documentation of the assignments was requested. UCC responded with the appropriate information.

The parties stipulated that by September 1, 1978 all of the contracts held by Midland had to be either collected or charged back. Therefore, at this time any balances remaining were fully payable. The trial court found that (a finding that is an issue here) between May 1, 1976 and September 1, 1978 Midland returned none of the

charged back contracts, and these allegedly uncollectible loans have never been properly accounted for.

Additionally, on the basis of Midland's business records, the court found that Midland transferred other parties' reserve funds to its profit and withheld refunds of others reserve funds despite valid demands and internal memoranda acknowledging the debt. Finally, the trial court found that Midland used its "large financial assets to discourage Plaintiff's claim and the claims of others...."

On these facts the trial court concluded that as of September 1, 1978 Midland held $25,815.09 of UCC's money. The trial court held that Midland had violated IND. CODE § 35–43–4–3 (1982) by criminally converting $20,687.16 of UCC's money. This amount is equal to the reserve funds originally owned by UCC and those with written assignments as of September 1, 1978. To this the trial court added prejudgment interest for total actual damages of $31,444.48.

The finding of criminal conversion led the trial court to apply IND.CODE § 34–4–30–1 (1986 Supp.),[1] which allows victims of certain crimes to recover three times actual damages, costs and attorney's fees. Accordingly, the trial court trebled the actual damages for a total of $94,333.44. From this amount the trial court subtracted $5,229.63 (the amount Midland paid on a partial summary judgment, plus interest) leaving $89,103.81. To this the court added $7,794.45 as the amount, untrebled, held in reserve funds without written assignments. The court then added $26,839.70 for attorney's fees, costs and expenses for a total judgment of $123,737.96.

On appeal Midland raises a number of issues. Consolidated and restated, these are:

(1) whether the trial court erred in holding the assignments of the reserve funds valid;

(2) whether the trial court erred in disallowing Midland's claimed credit for the allegedly charged back contracts;

(3) whether the trial court's finding of criminal conversion is supported by sufficient evidence; and

(4) whether the damages are excessive and inadequately supported by the evidence.

On appellate review, written findings of fact and conclusions of law will not be set aside unless they are clearly erroneous. Ind.Rules of Procedure, Trial Rule 52(A). In determining whether a trial court's findings are clearly erroneous, the Court of Appeals will not reweigh the evidence nor judge the credibility of witnesses. Instead, only the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom are examined. If these are sufficient to support the trial court's findings, then the judgment must be sustained. *Benefit Trust Life Ins. Co. v. Waggoner* (1985), Ind.App., 473 N.E.2d 646.

Midland's initial assignment of error is directed towards the trial court's finding that UCC was legally entitled to the terminated franchisees' reserve funds. Specifically, the trial court found that UCC held legally sufficient assignments for the funds, that there were no superior claimants, and that Midland had waived or was estopped from asserting any objections it might have had.

Midland essentially argues that the HBRA gives it an absolute, unfettered right to refuse to recognize any assignment, regardless of legal sufficiency. Midland asks the Court to find that UCC acquired no legal rights in the terminated franchisees' reserve funds, because Midland never assented to the assignments.

1. IND.CODE § 34–4–30–1 reads as follows:
   "Sec. 1. If a person suffers a pecuniary loss as a result of a violation of IC 35–43, he may bring a civil action against the person who caused the loss for:

(1) an amount not to exceed three (3) times his actual damages;
(2) the costs of the action; and
(3) a reasonable attorney's fee."

This position is untenable. In construing contracts, a court must adopt the construction that most closely harmonizes with justice, common sense and the probable intention of the parties in light of honest and fair dealing. *Rieth-Riley Const. v. Auto-Owners Mut. Ins.* (1980), Ind.App., 408 N.E.2d 640, *trans. denied.*

■ Midland's assumed interpretation is self-serving and one-sided. It is highly improbable that the franchisees' intended an agreement that effectively made Midland a partner, with veto power over disposition of assets. Logically it is much more likely that the HBRA clause regarding assignments was intended to protect Midland from potential multiple liability resulting from fabricated or contested assignments. The record in this case demonstrates that Midland had no need to invoke this clause's protection from the assignments at issue. There are no other claimants of the assigned funds and the assignments unambiguously transferred ownership to UCC. Thus there is no danger of multiple liability and Midland has no valid reason to contest the assignments. Midland does not explain its contention that the assignments are insufficient, except to reiterate its interpretation of the HBRA. Given the illogical, harsh, and improbable results that Midland's interpretation creates, it cannot be said that the trial court's finding is clearly erroneous.

On this point, Midland secondarily contends that there is insufficient evidence to support the trial court's holding that Midland either waived the HBRA assignment provisions or was estopped from asserting them. Waiver is defined as the voluntary relinquishment of a known right. *Lafayette Car Wash, Inc. v. Boes* (1972), 258 Ind. 498, 282 N.E.2d 837, *reh. denied.* Normally, silence or failure to act will not constitute waiver unless the holder of the right fails to speak or act when there is a duty to speak or act. *Grenchik et al. v. State ex rel. Pavlo* (1978), 175 Ind.App. 604, 373 N.E.2d 189. Equitable estoppel arises when one party's conduct leads another to believe that a right will not be asserted and

causes the one so misled to act to his detriment. *Walaschek & Assoc. Inc. v. Crow* (7th Cir.1984), 733 F.2d 51 (applying Indiana law). In order to establish the necessary prejudice, it must be shown that there is a loss or a potential loss of something to which one is legally entitled. *Indiv. Members Fire Dept. v. City of Mishawaka* (1976), 171 Ind.App. 95, 355 N.E.2d 447.

In support of its legal conclusions the trial court found that each time UCC terminated a franchise a UCC corporate officer visited the local Midland branch with a corporate resolution ratifying the change in ownership. Midland's internal memoranda demonstrated awareness of the changes in ownership at the corporate level. Finally the trial court found that Midland did not seek additional information about the assignments until after nearly a year of repeated demands for payment. Despite Midland's clamoring for a different interpretation, these findings are supported by the evidence and they support the trial court's finding of waiver or estoppel.

■ Midland waived any rights it had to interfere with the assignments when it failed to speak at the time it first became aware of the changes in ownership. If its contractual rights were as vital as Midland would have the Court believe, then it should have made further inquiry and announced its intentions at the time, not almost two years after the fact. Midland's failure to assert its rights mislead UCC into believing that the assignments were acceptable and led UCC into the potential loss of the assigned funds; thus Midland is also estopped from asserting its supposed right to refuse recognition of the assignments. Since the franchisees' reserve funds were legally assigned, and since Midland has waived or is estopped from asserting any rights it had to interfere with the assignments, the trial court did not err in holding that UCC was legally entitled to the former franchisees' holdback reserve funds.

Midland next contends that the trial court erred in failing to give it credit for

installment contracts that were allegedly charged off between May 1, 1976 and September 1, 1978. As stated above, the HBRA gave Midland the right to charge off uncollectible contracts against the holdback reserve fund. After charging off the uncollectible contracts, Midland was required to reassign the contracts to UCC so further collection efforts could be made. During the period between May 1, 1976 and September 1, 1978, Midland claims to have charged off $7,402.47 worth of contracts.

The trial court found that Midland was not entitled to credit for the allegedly charged-off contracts, because the only evidence Midland presented in support of its claim were periodic account statements with generalized debit notations stating how much was being charged off, but never identifying the specific contracts involved. Further, there was no evidence that any of the allegedly charged-off contracts were ever returned to UCC.

█ It is elementary that the burden of proving a fact rests upon the party asserting its existence. *McClure v. Pursell* (1855), 6 Ind. 330. This is because, "Courts cannot act upon the assumption that a state of facts exist which has not been proved, and which there has been no effort to prove." *Muncie Building Trades Council v. Umbarger* (1938), 215 Ind. 13, 16, 17 N.E.2d 828, 829. Midland made virtually no effort to prove its claimed credit and the trial court did not err in finding that Midland failed to sustain its burden.

Midland's next issue is that the trial court erred in finding a criminal conversion of UCC's funds and therefore in trebling the damages pursuant to the mandatory provisions of IND.CODE § 34-4-30-1. Midland's argument is that the evidence is insufficient to establish the elements of the crime.

Preliminarily, a substantial portion of Midland's argument on this issue, and on other points, as will be noted later, has been made moot by a very recent Indiana Supreme Court opinion. In *Obremski v. Henderson* (1986), Ind., 497 N.E.2d 909, the Supreme Court, in the course of approving the Court of Appeals holding in *Obremski,* also approved the Court of Appeals holding in *James v. Brink & Erb, Inc.* (1983), Ind. App., 452 N.E.2d 414. In *James,* the Court held that plaintiffs seeking treble damages under IND.CODE § 34-4-30-1 must prove their case by a preponderance of the evidence, not the clear and convincing evidence standard applied to awards of common-law punitive damages. Therefore Midland's insufficiency of the evidence claim must be viewed from the perspective of whether UCC proved criminal conversion by a preponderance of the evidence.

Conversion is statutorily defined at IND. CODE § 35-43-4-3 which reads:

"A person who knowingly or intentionally exerts unauthorized control over property of another commits criminal conversion, a Class A misdemeanor."

The *actus reus* of the crime, the exertion of unauthorized control, is clearly sustained by the evidence in this case. The parties stipulated that all the installment contracts had to be collected or charged off no later than September 1, 1978 and therefore the reserve funds were fully payable by this date. The trial court found, on the basis of sufficient evidence, that UCC had a superior claim to all the funds, either through assignment or original ownership. Thus it is clear that by September 1, 1978 Midland's control over UCC's funds was unauthorized. However this alone does not fully sustain the trial court's judgment.

The critical element in this and other crimes is the *mens rea* requirement. This is the element that differentiates criminal conversion from many other innocuous, every day occurrences. It is also this element that distinguishes this case from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to reach and where treble damages would be inappropriate.

The criminal conversion statute includes two levels of criminal intent, "knowingly" or "intentionally" and proof of either will sustain a conviction. "Knowingly" is the

lesser level of intent and is statutorily defined at IND.CODE § 35–41–2–2(b) (1982):

"A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."

Thus, in order to find a criminal conversion in this case, the evidence, at a minimum, must support the conclusion not only that Midland exerted unauthorized control over UCC's property, but also that Midland was aware of a high probability that this control was unauthorized.[2]

As already reiterated, the parties stipulated that the reserve funds were payable no later than September 1, 1978. As to the assigned accounts, the evidence supports the conclusion that Midland knew and tacitly approved of the assignments. There were no superior claimants to the money and UCC had made repeated demands for payment. As to the reserve funds originally owned by UCC, Midland's only real explanation for non-payment after September 1, 1978 is that it was an administrative oversight. This evidence tends to indicate Midland's awareness that its control was unauthorized. However, the additional evidence required to unequivocally sustain the necessary finding of a "high probability" of awareness is supplied by Midland's treatment of other parties.

■ UCC introduced evidence, Midland's business records, of Midland's practices with other parties' accounts. These documents showed that Midland transferred a number of other parties' reserve accounts to its profits, and in one instance delayed remitting another party's money despite an internal memorandum acknowledging that payment was due. It is clear that the trial court properly overruled Midland's objection to introduction of this evidence. Evidence of other, uncharged and possibly criminal activities, is admissible to prove intent. *Clarkson v. State* (1985), Ind., 486 N.E.2d 501; *Smeltzer v. State* (1962), 243 Ind. 437, 185 N.E.2d 428, *reh. denied.*

The trial court found the necessary degree of awareness from this evidence of a pattern of unauthorized control over others money. Not surprisingly Midland argues for a different interpretation of the evidence. Midland contends that a portion of the money it transferred to profits was originally its own. Of course, even if this is true, this, as the trial court noted, leaves a significant sum that Midland appropriated without legal justification. Midland further argues that the transfers and non-payment of others' funds was due to administrative difficulties in accounting for small sums, and because of the inefficiencies of its large number of employees. These after-the-fact justifications do not rise to the level of negating the proof of intent. Moreover, Midland does not attempt to explain why it actively discouraged and hindered UCC's and other parties' rightful claims.

■ The evidence amply demonstrates a high probability that Midland was aware its control of UCC's funds was unauthorized. UCC proved each element of its claim by a preponderance of the evidence and therefore the trial court was justified in finding that Midland knowingly or intentionally exerted unauthorized control over UCC's property.

Midland also argues that the finding of criminal conversion was error, because even if a conversion occurred, all of the elements of the crime were perpetrated outside the State of Indiana. In support, Midland points to cases where criminal convictions were reversed because the acts constituting the crimes occurred entirely outside the state and therefore there was no violation of the Indiana statute. *See, e.q., Green v. State* (1953), 232 Ind. 596, 115 N.E.2d 211.

■ Midland asserts that it is an Ohio corporation, that the intent to convert was formed at its corporate offices in Cincinnati, Ohio, and the funds were retained in its

---

2. UCC was not required to prove, as Midland asserts, that there was an intent to deprive UCC of the funds. Intent to deprive the victim of his property is an element of theft, IND.CODE § 35–43–4–2 (1982), but it is not an element of the crime of conversion.

Cincinnati bank accounts. Midland does not deny that its wholly owned subsidiary, Midland-Guardian Company of Indiana, Inc., is an Indiana corporation, nor that it maintained branch offices in Indiana, nor that at least part of the money and contracts in question here were obtained in Indiana. Thus, there is little doubt that Indiana courts have civil, subject-matter jurisdiction, under the well-established "most intimate contacts" test. *See, Suyemasa v. Myers* (1981), Ind.App., 420 N.E.2d 1334.

Furthermore, the interpretation that Midland puts forth would have disastrous implications for the ability of this state to police the conduct of foreign corporations. The rule in Indiana has long been:

"If a person outside of the territorial limits of a state puts in operation forces which produce a result constituting a crime within the limits of the state, and if jurisdiction of his person can be obtained within the state, he may be prosecuted and punished for the crime although his acts in connection therewith took place outside of the territorial jurisdiction." *Karvalsky v. Becker* (1940), 217 Ind. 524. 531, 29 N.E.2d 560, 562.

Midland has not contested personal jurisdiction and given the previous conclusions, Midland's acts constituted a crime within this state. Therefore, even under the criminal jurisdictional standards Indiana courts have jurisdictional authority to punish Midland for its conversion of UCC's property.

The final general issue that Midland raises regards the damage award, which Midland contends is excessive and not supported by sufficient evidence. Specifically Midland contends that the trial court erred by permitting UCC's attorney to testify, that the award of attorney fees was not supported by sufficient evidence, that the awarding and trebling of prejudgment in-

terest was erroneous and that the court erred in awarding expenses.

■ Midland argues that permitting UCC's attorney to testify about his fees and expenses was a violation of the Code of Professional Responsibility, DR 5–102(A) which mandates withdrawal when an attorney is called as a witness for his client, except in certain limited circumstances. One such circumstance is set out in DR 5–101(B)(3) which, in pertinent part, provides:

"(B) A lawyer shall not accept employment ... if he knows ... that he ... ought to be called as a witness, except that he ... may testify:

\* \* \* \* \* \*

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client."

UCC's attorney's testimony was limited to the nature and value of his legal services and therefore there was no violation of the Code of Professional Responsibility. Furthermore, UCC's entitlement to attorney's fees was not a contested issue. Once UCC proved that a conversion occured, it was automatically entitled to reasonable attorney's fees. *Obremski v. Henderson, supra.*

Midland next contends that there is insufficient evidence to conclude that the attorney's fee was reasonable. Generally, what constitutes a reasonable attorney's fee is largely within the trial court's discretion. *Canaday v. Canaday* (1984), Ind. App., 467 N.E.2d 783. However, in nonroutine cases, where the amount of the fee is not inconsequential, there must be objective evidence supporting the court's determination. It is generally agreed that the factors enumerated in the Code of Professional Responsibility, DR 2–105(B)[3] provide

---

**3.** In pertinent part, DR 2–105(B) reads:

"(B) ... Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved,

and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

useful guidelines for evaluating the reasonableness of attorney's fees. *Smith v. Kendall* (1985), Ind.App., 477 N.E.2d 953; *Waxman Industries v. Trustco Development Co.* (1983), Ind.App., 455 N.E.2d 376.

■ In the present case, the trial court awarded $18,447.50 as attorney's fees. In support of this award, UCC's attorney testified and submitted an itemization of hours spent over the six and one half years leading to trial. This list contained a description of each task performed, the hourly billing rate for the attorney performing the task, and the amount billed. The attorney testified that he had represented UCC since its corporate inception, that he had practiced in the area for many years and that he and his firm had handled this suit since before it was filed. He also answered questions regarding specific items. Midland's cross-examination was limited to what the filing fees and the witness fees were. This evidence forms a sufficient evidentiary basis on which the trial court could have found that the fee was reasonable. This finding is not clearly erroneous and therefore the amount of the attorney's fee award is sustained.

Midland next argues that the trial court erred in awarding prejudgment interest and in trebling the interest along with the other damages. Indiana law generally permits the assessment of prejudgment interest as an element of damages where the damages are fixed and ascertainable at a definite time prior to rendering judgment. *Courtesy Enterprises, Inc. v. Richards Labs.* (1983), Ind.App., 457 N.E.2d 572. This rule explains the holding in the case that Midland cites in support of its claim.

In *New York, etc., R. Co. v. Roper* (1911), 176 Ind. 497, 96 N.E. 468, the Court held it improper to award prejudgment interest on punitive damages or where the amount of recovery is fixed by statute. This holding is merely an application of the

rule echoed in *Courtesy Enterprises, Inc.,* supra, because punitive damages and fixed statutory penalties are not legally ascertainable or even in existence until a judgment has been rendered.

■ The damages that UCC recovered are not punitive damages or a fixed statutory penalty. While treble damages are punitive in nature, "a recovery of treble damages under this section [IC 34–4–30–1] is regarded as distinct from recovery of common law punitive damages." *Obremski v. Henderson, supra.* IND.CODE § 34–4–30–1 also does not create a fixed statutory penalty, rather it provides for trebling actual damages under certain conditions. The amount of actual recovery will vary widely from case to case. Since prejudgment interest was properly an element of the actual damages in this case, and since the statute mandates trebling actual damages, there was no error in trebling the interest.

Midland's final contention is that the trial court erred in awarding UCC's litigation expenses as an element of damages. In its general award of $26,839.70 for attorney's fees the trial court included the undifferentiated amount of $8,392 for such expenses as deposition transcription, meals, lodging, witness fees and filing fees. IND.CODE § 34–4–30–1 provides for three items of recovery: three times actual damages, costs, and attorney's fees. Since neither party argues that expenses are or should be an element of actual damage, it only remains to decide whether the expenses are properly includible as either costs or attorney's fees.

■ The term "costs" is an accepted legal term of art that has been strictly interpreted to include only filing fees and statutory witness fees. *See, State v. Holder et al.; Rentchler et al.* (1973), 260 Ind.

---

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

336, 295 N.E.2d 799; *Calhoun v. Hammond* (1976), 169 Ind.App. 39, 345 N.E.2d 859.

Thus, in the absence of manifest contrary legislative intent, the term "costs" must be given its accepted meaning which does not include litigation expenses.

■ The term "attorney's fees" also cannot be interpreted as a statutory authorization for awarding litigation expenses. "Attorney's fees" includes only those amounts as paid compensation to the attorney. In contrast, the litigation expenses involved here are amounts advanced by the attorney to the client and not a fee for services performed. *Cox v. Ubik* (1981), Ind.App., 424 N.E.2d 127; *see also, State v. Hicks* (1984), Ind.App., 465 N.E.2d 1146, *reh. denied.*

This statute is largely a penal measure and as such it must be strictly construed. *Evansville, etc., Ry. Co., Inc. v. So. Ind. R.E. Corp.* (1953), 231 Ind. 648, 109 N.E.2d 901, *reh. denied.* Therefore, in the absence of express statutory authority, this case must be reversed and remanded to the trial court for the sole purpose of excising the improper award of litigation expenses from the properly allowed attorney's fees and costs. In all other things the trial court is affirmed.

Affirmed in part, reversed and remanded in part.

STATON, P.J., and GARRARD, J., concur.