# FOR PUBLICATION



FILED

Apr 25 2012, 8:22 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RODNEY V. TAYLOR**
Christopher & Taylor
Indianapolis, Indiana

**SCOTT A. BENKIE**
**DOUGLAS A. CRAWFORD**
Benkie & Crawford
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**STEVEN M. CRELL**
**EDWARD F. SCHRAGER**
Cohen Garelick & Glazier
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| THE KROGER COMPANY, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 49A05-1108-PL-412 |
| ) | |
| WC ASSOCIATES, LLC, ) | |
| as successor in interest to ) | |
| METRO ACQUISITIONS, LLC, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Heather A. Welch, Special Judge
Cause No. 49D12-0908-PL-38516

**April 25, 2012**

**BARNES, Judge**

## Case Summary

The Kroger Company ("Kroger") appeals summary judgment granted in favor of WC Associates, LLC ("WC"), as successor in interest to Metro Acquisitions, LLC ("Metro"). We affirm in part, reverse in part, and remand.

## Issues

Kroger raises three issues, which we restate as:

> I. whether the trial court properly found that Kroger breached a reciprocal easement agreement;
>
> II. whether the trial court properly found that Kroger committed criminal conversion, criminal trespass, and criminal mischief; and
>
> III. whether the trial court properly awarded sanctions against Kroger.

On cross-appeal, WC argues that it is entitled to appellate attorney fees.

## Facts

In November 1993, Kroger entered into a Reciprocal Easement Agreement ("Agreement") with Metro, a developer. The Agreement provided that Kroger owned Parcel I, near Rockville Road in Indianapolis. Metro owned Parcel II, III, and IV. Kroger and Metro desired "to establish certain rights and servitudes over the Parcels in order to facilitate the integrated use thereof as a shopping center," which was named Westpoint Commons. Appellant's App. p. 203. The Agreement addressed easements, maintenance and upkeep of the common areas, liability insurance, damage or destruction

2

of the property, restrictions, taxes, default, and signage. Regarding easements, the

Agreement provided in part:

> Section 2.4 – The parties hereby establish an exclusive easement over Parcel I in favor of Parcel(s) II, III, and IV to permit the construction, use and maintenance of a sign at the location designated on the Plot Plan, including any electrical lines required to illuminate the sign, provided that all lines are constructed underground.

Id. at 203-04. With respect to signage, the Agreement provided:

> Section 9.1 – Developer shall erect on Parcel I a pylon for a sign at the location as shown on the Plot Plan, subject to the reasonable approval of Kroger prior to erection. After completion of the construction thereof, Kroger shall reimburse Developer for that portion of the costs of construction thereof equal to the product of multiplying such costs times a fraction, the numerator of which is the square footage of the sign panel designated by Kroger to be located thereon and the denominator of which shall be the total square footage of all sign panels to be located thereon, but in no case in excess of Fifteen Thousand Dollars ($15,000.00).

> Section 9.2 – Kroger shall maintain the pylon for the sign shown on the Plot Plan in a good state of repair and operation at all times. Parcels II, III and IV Owners shall reimburse Kroger not more frequently than once each calendar month for its prorata share of the costs of maintaining the pylon and illuminating the panels located thereon . . . .

> Section 9.3 – Kroger shall have the right to attach to and the obligations to maintain at its expense, a sign panel on the pylon in the location immediately below the name of the Shopping Center and permanent signs on the exterior of the storeroom located on Parcel I. Each such sign shall identify Kroger, its tenant or occupant, or the services or products of Kroger or its tenants or occupants in a suitable fashion consistent with their normal practice and the requirements of Section 9.5 hereof, and nothing contained herein shall limit or proscribe the use or display of non-permanent signs on the

storeroom located on Parcel I in a manner consistent with the normal business of the occupant thereof.

Section 9.4 – Parcel II and IV shall have the right to attach and maintain, at its expense, a sign panel on the pylon and may place permanent signs on the exterior of the buildings located on Parcel II and IV thereof in suitable fashion consistent with its normal practice and the requirements of Section 9.5 hereof . . . .

Section 9.5 – All permanent signs and panels hereinabove provided shall be of good quality and in good operating condition, appearance, maintenance and repair at all times and shall be of a design that is consistent with the architectural design of the Shopping Center and subject to any and all applicable governmental approvals.

Id. at 207. The Agreement also provided: "In the event of litigation by reason of this Agreement, the prevailing party in such litigation shall be entitled to recover reasonable attorneys' fees in addition to all other expenses incurred by such litigation." Id.

Kroger and Metro entered into a First Amendment to Reciprocal Easement Agreement ("Amendment") in August 1996, and the Amendment provided:

1. Section 2.4 of Article II shall be amended to read: "The parties hereby establish a Exclusive Easement over Parcel IV in favor of Parcel(s) I, II and III to permit the construction, use and maintenance upon Parcel IV of a sign at the location designated on the Plot Plan . . . . Access by Kroger to maintain the pylon and underground electrical service to the sign shall be granted upon the parking lot and driveway areas that currently exist or may exist upon Parcel IV from time to time.

2. The sign referenced in Article IX, Section 9.1, is to be located on Parcel IV . . . .

4

3.   All other terms and conditions of this Agreement shall remain in full force and effect except as expressly modified by this Amendment.

Id. at 220.  A sign pylon was then constructed on Parcel IV, which was owned by WC's predecessor.

At some point, Kroger began operating a fuel center on property adjacent to the Westpoint Commons shopping center.  In April 2009, Kroger removed the top portion of the Westpoint Commons' sign structure, changed the Kroger sign panel, added a panel to advertise its fuel prices, and left the other business's sign panels without lighting and electricity.   WC hired contractors to restore the original sign pylon at a cost of $47,954.42.

In August 2009, WC filed a complaint against Kroger[1] for breach of contract, theft, criminal conversion, criminal trespass, and criminal mischief.  WC requested treble damages pursuant to Indiana Code Section 34-24-3-1.   Kroger filed a counterclaim against WC, alleging breach of contract, conversion, criminal mischief, promissory estoppel, and constructive fraud.

In February 2010, WC filed a motion for summary judgment, arguing that Kroger had breached the Agreement and that Kroger's conduct amounted to criminal trespass, criminal mischief, and criminal conversion.  Kroger responded and filed a cross-motion for summary judgment regarding WC's claims.  Kroger filed a designation of evidence

_____

[1] KG Indianapolis Portfolio, L.P., and H&R Real Estate Investment Trust were also named as defendants. The two companies filed a motion for summary judgment, and the trial court granted summary judgment in their favor concluding that neither company was responsible for Kroger's actions.

that included affidavits from three Kroger employees, Daniel DiCioccio, Nicholas Alm, and Doug Burdine.

WC filed a reply and argued that Kroger had submitted false affidavits. WC requested sanctions pursuant to Indiana Trial Rule 56(G). After a hearing, the trial court entered findings of fact and conclusions thereon ruling on the motion for summary judgment and cross motion for summary judgment. The trial court found, "because the Sign Pylon is located on Parcel IV, which is owned by WC, that WC is the owner of the Sign Pylon." Appellant's App. p. 17. The trial court found that the Agreement and Amendment did not "give Kroger the right to deconstruct, reconstruct, modify, add anything to or take anything away from or otherwise in any way alter or affect the Sign Pylon, its function or operation." Id. at 24. The trial court found that Kroger exceeded the scope of its rights and breached the Agreement and Amendment. The trial court concluded that WC incurred $47,954.42 in damages as a result of the breach and was entitled to attorney fees as the prevailing party under the Agreement. The trial court also concluded that Kroger committed criminal conversion, criminal trespass, and criminal mischief. In sum, the trial court granted summary judgment to WC on its motion for summary judgment and also granted summary judgment to WC on Kroger's counterclaims.

The trial court permitted Kroger to file a written response to WC's request for sanctions. The trial court also scheduled a damages hearing to address Indiana Code Section 34-24-3-1 and reasonable attorney fees. After the hearing, the trial court found that portions of DiCioccio's affidavit were misleading and false and that DiCioccio "on

6

behalf of Kroger acted in bad faith in an attempt to delay these proceedings and mislead the Court regarding the facts designated and whether a material dispute of fact was present." Id. at 42. The trial court ordered Kroger to pay WC's attorney fees but noted that Kroger was already required to pay WC's attorney fees under the Agreement. The trial court then ordered Kroger to pay WC's attorney fees in the amount of $71,509.25. The trial court also ordered Kroger to pay additional damages of $23,977.21 under Indiana Code Section 34-24-3-1. In total, the trial court ordered Kroger to pay damages of $143,440.88 to WC. Kroger now appeals.

## Analysis

### I. Breach of Contract

Kroger argues that the trial court erred by granting summary judgment to WC on its breach of contract claim. Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); Mangold v. Ind. Dep't of Natural Res., 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. Mangold, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. Id. We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. Id. at 974.

Where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in this case, the entry of specific

7

findings and conclusions does not alter the nature of our review. Rice v. Strunk, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. Id. They merely aid our review by providing us with a statement of reasons for the trial court's actions. Id.

According to Kroger, the Agreement and Amendment to the Agreement unambiguously allowed it to modify the sign pylon. The interpretation of a contract is a pure question of law and is reviewed de novo. Dunn v. Meridian Mut. Ins. Co., 836 N.E.2d 249, 251 (Ind. 2005). Courts should interpret a contract so as to harmonize its provisions, rather than place them in conflict. Id. at 252. We must look at the contract as a whole. Id. We will construe the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless. Sunburst Chem., LLC v. Acorn Distributors, Inc., 922 N.E.2d 652, 654 (Ind. Ct. App. 2010). If a contract's terms are clear and unambiguous, we must give those terms their clear and ordinary meaning. Dunn, 836 N.E.2d at 252. "A contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." Beam v. Wausau Ins. Co., 765 N.E.2d 524, 528 (Ind. 2002). "When a contract's terms are ambiguous or uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the fact-finder." Johnson v. Johnson, 920 N.E.2d 253, 256 (Ind. 2010). The terms of a contract are not ambiguous merely because a controversy exists between the parties concerning the proper interpretation of terms. Sunburst, 922 N.E.2d at 654.

At first, the sign pylon was to be located on Parcel I, which is owned by Kroger, and the Agreement provided:

8

Section 2.4 – The parties hereby establish an exclusive easement over Parcel I in favor of Parcel(s) II, III, and IV to permit the construction, use and maintenance of a sign at the location designated on the Plot Plan, including any electrical lines required to illuminate the sign, provided that all lines are constructed underground.

* * * * *

Section 9.1 – Developer shall erect on Parcel I a pylon for a sign at the location as shown on the Plot Plan, subject to the reasonable approval of Kroger prior to erection. After completion of the construction thereof, Kroger shall reimburse Developer for that portion of the costs of construction thereof equal to the product of multiplying such costs times a fraction, the numerator of which is the square footage of the sign panel designated by Kroger to be located thereon and the denominator of which shall be the total square footage of all sign panels to be located thereon, but in no case in excess of Fifteen Thousand Dollars ($15,000.00).

Section 9.2 – Kroger shall maintain the pylon for the sign shown on the Plot Plan in a good state of repair and operation at all times. Parcels II, III and IV Owners shall reimburse Kroger not more frequently than once each calendar month for its prorata share of the costs of maintaining the pylon and illuminating the panels located thereon . . . .

Section 9.3 – Kroger shall have the right to attach to and the obligations to maintain at its expense, a sign panel on the pylon in the location immediately below the name of the Shopping Center and permanent signs on the exterior of the storeroom located on Parcel I. Each such sign shall identify Kroger, its tenant or occupant, or the services or products of Kroger or its tenants or occupants in a suitable fashion consistent with their normal practice and the requirements of Section 9.5 hereof, and nothing contained herein shall limit or proscribe the use or display of non-permanent signs on the storeroom located on Parcel I in a manner consistent with the normal business of the occupant thereof.

Section 9.4 – Parcel II and IV shall have the right to attach and maintain, at its expense, a sign panel on the pylon and

9

may place permanent signs on the exterior of the buildings located on Parcel II and IV thereof in suitable fashion consistent with its normal practice and the requirements of Section 9.5 hereof . . . .

Section 9.5 – All permanent signs and panels hereinabove provided shall be of good quality and in good operating condition, appearance, maintenance and repair at all times and shall be of a design that is consistent with the architectural design of the Shopping Center and subject to any and all applicable governmental approvals.

Appellant's App. at 203-04, 207. That Agreement was amended due to a change in the location of the sign pylon to Parcel IV, which was owned by the developer, and the Amendment provided:

1. Section 2.4 of Article II shall be amended to read: "The parties hereby establish a Exclusive Easement over Parcel IV in favor of Parcel(s) I, II and III to permit the construction, use and maintenance upon Parcel IV of a sign at the location designated on the Plot Plan . . . . Access by Kroger to maintain the pylon and underground electrical service to the sign shall be granted upon the parking lot and driveway areas that currently exist or may exist upon Parcel IV from time to time.

2. The sign referenced in Article IX, Section 9.1, is to be located on Parcel IV . . . .

3. All other terms and conditions of this Agreement shall remain in full force and effect except as expressly modified by this Amendment.

Id. at 220.

Under the Agreement and Amendment, the developer, WC's predecessor, was to construct the sign pylon. Kroger had the right to attach and the obligation to maintain a "sign panel on the pylon." Id. at 207. Kroger also had the obligation to maintain the

10

"pylon" in a "good state of repair and operation at all times." Id. The trial court concluded that Kroger did not have the "right to deconstruct, reconstruct, modify, add anything to or take anything away from or otherwise in any way alter or affect the Sign Pylon, its function or operation." Id. at 24.

Kroger argues that the trial court's finding that WC owned the sign pylon is unsupported by the designated evidence. According to Agreement and Amendment, the sign pylon was constructed on Parcel IV, which is owned by WC. Additionally, according to the Agreement and Amendment, the developer, WC's predecessor, constructed the sign pylon. Further, Kroger had an easement on Parcel IV to maintain the sign pylon. Under the Agreement and Amendment, the trial court properly found that WC owned the sign pylon.

Kroger also argues that the trial court's interpretation of the Agreement and Amendment was incorrect because of a September 1994 letter from Kroger to Eaton & Lauth (the developer and a predecessor to WC). However, if the Agreement and Amendment are unambiguous, we cannot examine such extrinsic evidence. See Johnson, 920 N.E.2d at 256. Thus, we must first determine if the Agreement and Amendment are ambiguous.

Kroger argues that the Agreement and Amendment are ambiguous because the terms "sign panel" and "sign pylon" are not defined. The common definition of "pylon" is "a relatively tall structure at the side of a gate, bridge, or avenue, marking an entrance or approach." DICTIONARY.COM, http://www.dictionary.com (last visited March 19, 2012). A "panel" is defined as "a distinct portion, section, or division of a wall,

11

wainscot, ceiling, door, shutter, fence, etc., especially of any surface sunk below or raised above the general level or enclosed by a frame or border." Id. Given the common and ordinary definitions of these terms, it is clear that "sign pylon" refers to the entire structure, while "sign panel" refers to the individual signs on the pylon. The lack of definitions of these terms in the Agreement and Amendment does not create an ambiguity.

Kroger also contends that the "parties clearly contemplated that Kroger's need to change its signage would evolve over time consistent with its normal practice and the prevailing customs of the day." Appellant's Br. p. 13. Kroger relies upon the portion of the Agreement that provides:

> Kroger shall have the right to attach to and the obligations to maintain at its expense, a sign panel on the pylon in the location immediately below the name of the Shopping Center and permanent signs on the exterior of the storeroom located on Parcel I. Each such sign shall identify Kroger, its tenant or occupant, or the services or products of Kroger or its tenants or occupants in a suitable fashion consistent with their normal practice and the requirements of Section 9.5 hereof . . . .

Appellant's App. p. 207. However, the "normal practice" language in the Agreement referred only to the identification of Kroger and its services or products on the individual sign panel. Nothing in that language gave Kroger the right to modify the sign pylon or attach multiple sign panels.

The Agreement required Kroger to "maintain" the sign pylon "in a good state of repair and operation" and allowed it to attach and maintain a sign panel. Appellant's App. at 207. We agree with the trial court that neither the Agreement nor the

12

Amendment allowed Kroger to modify the sign pylon or attach multiple sign panels to the pylon. We conclude that the Agreement and Amendment were unambiguous and that the trial court properly interpreted the documents. As a result, we agree that Kroger breached the Agreement, and the trial court properly granted summary judgment to WC on this issue.

## II. *Criminal Conversion, Criminal Trespass, and Criminal Mischief*

Next, Kroger argues that the trial court erred by granting summary judgment to WC on its claims of criminal conversion, criminal trespass, and criminal mischief. The trial court found that Kroger had "knowingly or intentionally exerted unauthorized control over WC's property," that Kroger had "knowingly or intentionally interfered with the possession or use of WC's property," and that Kroger had "recklessly, knowingly or intentionally damaged or defaced property of another with the consent of WC." Appellant's App. at 26-27.

A person who "knowingly or intentionally interferes with the possession or use of the property of another person without the person's consent" commits criminal trespass. Ind. Code § 35-43-2-2(a)(4). A person who "knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion." I.C. § 35-43-4-3(a). A person who "recklessly, knowingly, or intentionally damages or defaces property of another person without the other person's consent" commits criminal mischief. I.C. § 35-43-1-2(a)(1).

The criminal trespass and criminal conversion statutes include two levels of criminal intent–knowingly or intentionally. "A person engages in conduct 'intentionally'

13

if, when he engages in the conduct, it is his conscious objective to do so." I.C. § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b). The criminal mischief statute includes a third level of criminal intent–recklessly. "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c).

In the criminal conversion context, we have held that criminal intent is an essential element to the offense that must be proven. NationsCredit Commercial Corp. v. Grauel Enterprises, Inc., 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998), trans. denied. "It is this mens rea requirement that differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to reach." Id. "The legislature did not intend to criminalize bona fide contract disputes." Id. at 1079.

Kroger argues that it reasonably believed it had a right to modify the sign pylon and that this is a basic contract dispute, not a case of criminal intent. According to Kroger, the trial court should have granted its cross-motion for summary judgment on the criminal conversion, trespass, and mischief claims and should have denied WC's motion for summary judgment on those claims. WC argues that, because the contract was unambiguous, the trial court was correct in granting summary judgment.

Under WC's argument, anytime a party to an unambiguous contract breaches the contract, the party's criminal intent would be established. Although we disagree with

14

Kroger's interpretation of the Agreement and Amendment and concluded that the Agreement was unambiguous, our holding does not mean that Kroger had criminal intent in modifying the sign pylon or adding an additional sign panel. We cannot say that every breach of contract case results from a criminal intent. Our supreme court recently made the same observation when it held that a finding of breach of contract "does not lead inescapably to a finding of criminal fraud." Klinker v. First Merchants Bank, N.A., No. 01S04-1107-PL-438, slip op. at 4 (Ind. Mar. 20, 2012). Some additional evidence other than a simple breach of contract is necessary to establish criminal intent. For example, in Midland-Guardian Co. v. United Consumers Club, Inc., 499 N.E.2d 792, 798 (Ind. Ct. App. 1986), Midland's "pattern of unauthorized control over others money" showed the high probability of awareness that its control over UCC's funds was unauthorized.

Furthermore, "we normally regard a finding of criminal intent as the sort of determination requiring intervention by a fact-finder. . . ." White v. Indiana Realty Associates II, 555 N.E.2d 454, 458 (Ind. 1990). The granting of summary judgment in a civil action involving criminal intent is a "rare situation." Id. Our supreme court recently held that "finding criminal intent in the absence of a confession invariably requires weighing evidence, judging witness credibility, and drawing reasonable inferences from the facts, all of which are improper in considering a motion for summary judgment." Klinker, slip op. at 6, __ N.E.2d at __. "[S]ummary judgment is almost never appropriate where the claim requires a showing that the defendant acted with criminal intent or fraudulent intent." Id.

15

We conclude that the evidence here is "definitely not so overwhelming as to mandate us" to conclude that Kroger had criminal intent when it modified the sign pylon. Auto-Owners Ins. Co. v. Harvey, 842 N.E.2d 1279, 1291 (Ind. 2006). Conversely, neither is the evidence so clear that Kroger is entitled to summary judgment in its favor. We conclude that the trial court erred when it granted WC's motion for summary judgment regarding its criminal mischief, criminal trespass, and criminal conversion claims. Kroger's intent is for a jury to decide.

### III. Sanctions

The final issue is whether the trial court properly awarded sanctions against Kroger for its affidavits filed as part of the summary judgment proceedings. A trial court enjoys broad discretion in determining appropriate sanctions. Davidson v. Perron, 756 N.E.2d 1007, 1013 (Ind. Ct. App. 2001). The trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances of the case, or if it misinterprets the applicable law. Id. Absent clear error and resulting prejudice, the trial court's determinations with respect to violations and sanctions should not be overturned. Id.

WC requested sanctions pursuant to Indiana Trial Rule 56(G), which provides:

> Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

16

"This rule should be strictly enforced to preserve the intent and purpose of the summary judgment proceeding." GDC Envtl. Services, Inc. v. Ransbottom Landfill, 740 N.E.2d 1254, 1261 (Ind. Ct. App. 2000). As a general proposition, a finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will. Monroe Guar. Ins. Co. v. Magwerks Corp., 829 N.E.2d 968, 977 (Ind. 2005).

The trial court here found DiCioccio's affidavit, which was submitted with Kroger's response in opposition to WC's motion for summary judgment and in support of Kroger's cross motion for summary judgment, to be problematic. Specifically, the trial court found that DiCioccio's affidavit misrepresented the contents of Exhibit 1 as an agreement for the construction of the sign pylon, that the affidavit misrepresented the contents of a September 19, 1994 letter to Eaton & Lauth, and that the affidavit misrepresented that Kroger obtained government approval for the modification of the sign pylon.

Having reviewed the affidavit and the attached documents, we agree that the affidavit misrepresented the contents of the documents and the circumstances. Kroger was given the opportunity to explain the inconsistencies and failed to adequately do so. The trial court concluded that Kroger "acted in bad faith in an attempt to delay these proceedings and mislead the Court regarding the facts designated and whether a material dispute of fact was present." Appellant's App. p. 42. We cannot say that the trial court abused its discretion in making this determination.

### IV. Appellate Attorney Fees

WC requests appellate attorney fees based on the prevailing party provision of the Agreement and Indiana Appellate Rule 66(E). An award of attorney fees is appropriately limited to those fees incurred because of the basis underlying the award. Nance v. Miami Sand & Gravel, LLC, 825 N.E.2d 826, 838 (Ind. Ct. App. 2005), trans. denied. The party requesting an assessment of attorney fees bears the burden of proving an appropriate allocation of fees between issues for which attorney fees may be assessed and those for which they may not. Id. "While a perfect breakdown is neither realistic nor expected, a reasonable, good faith effort is anticipated." Id.

Appellate attorney fees are appropriate under the prevailing party provision in the Agreement, which provides: "In the event of litigation by reason of this Agreement, the prevailing party in such litigation shall be entitled to recover reasonable attorneys' fees in addition to all other expenses incurred by such litigation." Appellant's App. at 207. WC is entitled to appellate attorney fees by reason of the breach of the Agreement, and we remand to the trial court for calculation of those fees. However, the Agreement does not entitle WC for appellate attorney fees for its criminal conversion, criminal trespass, and criminal mischief actions.

WC also asks for appellate attorney fees under Indiana Appellate Rule 66(E). Under Indiana Appellate Rule 66(E), we "may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith." Such damages are in our discretion and may include attorney's fees. We must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal. In re Estate of Carnes, 866 N.E.2d 260, 267 (Ind. Ct. App. 2007). A strong showing is

18

required to justify an award of appellate damages, and the sanction is not imposed to punish mere lack of merit, but something more egregious. Id. WC argues that Kroger continued to "misrepresent the facts" and continued to "assert to this Court the same false testimony that was asserted in DiCioccio's Affidavit." Appellant's Br. p. 32. However, WC does not explain its argument with any specificity. We conclude that WC has failed to demonstrate that it is entitled to appellate attorney fees based on Indiana Appellate Rule 66(E).

**Conclusion**

The trial court properly granted summary judgment to WC on its breach of contract claim and properly granted WC's request for sanctions under Indiana Trial Rule 56(G). However, the trial court erred by granting summary judgment on WC's claims of criminal mischief, criminal trespass, and criminal conversion. We grant WC's request for appellate attorney fees regarding its breach of contract action, but we deny WC's request for appellate attorney fees pursuant to Indiana Appellate Rule 66(E). We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

BAKER, J., and BRADFORD, J., concur.